IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| **BRIAN LEE BIRGE,** | ) |
| **Plaintiff,** | ) ) ) ) |
| vs. | ) Case No. 20-cv-769-RJD ) |
| **VENERIO SANTOS, M.D., LANA NALEWAJKA, and WEXFORD HEALTH SOURCES, INC.,** | ) ) ) ) ) |
| **Defendants.** | |

# ORDER

**DALY, Magistrate Judge:**

Plaintiff, an inmate of the Illinois Department of Corrections (IDOC), filed this suit pursuant to 42 U.S.C. §1983 (Docs. 1, 47). Plaintiff alleges that Dr. Venerio Santos and Lana Nalewajka were deliberately indifferent to his serious medical needs at Centralia Correctional Center (Docs. 1, 47). Plaintiff's Amended Complaint also contains a claim against Wexford Health Sources, Inc. ("Wexford"), a company that contracts with IDOC to provide medical treatment to IDOC inmates (Doc. 47).

This matter comes before the Court on the Motion for Preliminary Injunction (Docs. 62, 63) filed by Plaintiff. Defendants responded (Docs. 67 and 69). Plaintiff filed a Reply (Doc. 74). The Court held a hearing on September 21, 2021 (Doc. 80). As explained further, Plaintiff's Motion is GRANTED.

## Medical Records and Litigation History

From 2011-2015, Plaintiff underwent three back surgeries to treat degenerative disc

disorder, herniated discs, and spinal stenosis (Doc. 63-1, pp. 4, 38; Doc. 63-5, p. 22).[1]  Plaintiff arrived at Centralia Correctional Center in March 2017 (Doc. 1, p. 5).  In Plaintiff's medical "Transfer Screening" paperwork, a nurse noted his history of spinal surgery (Doc. 69-1, p. 22).  The "health information administrator" at Centralia ordered Plaintiff's prior medical records in June 2017 (Doc. 69-1, p. 244).  Plaintiff's medical records from Centralia indicate that he regularly saw a physician in 2017, but the physicians' handwritten notes are mostly illegible.  It appears that a physician ordered Motrin 400 mg, twice daily in May 2017 (Doc. 69-1, p. 35), then Motrin, 600 mg twice daily in June 2017 (*Id*., p. 41) then Mobic (dosage illegible) in July 2017 (*Id*., p. 42), and then Motrin 600 mg three times daily in August 2017 (*Id*., p. 48).  Plaintiff reported 10/10 back pain on September 21, 2017 and it appears that the next day he saw a doctor for "severe back pain" and the physician again ordered Motrin, 600 mg to be taken three times daily (*Id*., p. 54, 57).  In January 2018, Plaintiff reported to a nurse that Motrin 600 mg was not effective (*Id*., p. 69).

Defendant Dr. Santos ordered x-rays of Plaintiff's lumbar spine in April 2018. (Doc. 63-4, p. 24).  The radiologist's report stated that Plaintiff had degenerative changes at the sacroiliac joint "on both sides" (*Id*.).  At this point, Plaintiff was taking Naprosyn, 50 mg twice a day (Doc. 69-1, p. 82).  Plaintiff rated his back pain at 8-9/10 on May 2, 2018 (Doc. 69-1, p. 84).  A nurse noted that his pain "goes down leg" (*Id*.).  The nurse also noted "meds not helping neither are the exercises.  Stated has been walking" (Doc. 69-1, p. 85).  In June 2018, it appears that Dr. Garcia (not a defendant) again prescribed Motrin, 600 mg.  Plaintiff continued taking Motrin, 600 milligrams three times a day in October 2018, when he reported to a nurse that he had "shooting pain" with side-to-side movement (Doc. 69-1, p. 117, 118).

---

[1] From the medical records, it appears that Plaintiff was not incarcerated from 2011-2015.

From the parties' briefings, it appears that Plaintiff did not receive treatment for his back pain from October 2018-September 2019, although his Motrin prescription was renewed (Doc. 63, f.n.3; Doc. 69, p. 5).  Plaintiff submitted multiple grievances related to treatment of his back pain in September and October 2019 (Doc. 63-6, p. 4, 6, 11, 15, 16, 18, 20).  Plaintiff saw a physician on August 23, 2019, and received a back brace (Doc. 69-2, p. 7).  Dr. Santos ordered Cymbalta on September 12, 2019, which Plaintiff did not want to take because he believed it was a "psychotropic and nerve agent" (Doc. 63-6, p. 6).

Also on September 12, 2019, Dr. Santos requested permission from Wexford through the "collegial review process" to send Plaintiff to an orthopedic surgeon (Doc. 63-3, p. 179-806).  Dr. Ritz, a "dedicated utilization management physician" with Wexford, denied this request (Doc. 63-3, p. 805).  Plaintiff then underwent a physical therapy evaluation and received a "Home Exercise Program" to perform on his own (Doc. 69-2, p. 279).  The physical therapist further noted "he would benefit from skilled physical therapy to address these deficits…he may also benefit from further imaging to rule out internal damage." (*Id*.).

After receiving approval through the collegial review appeal process (Doc. 69-2, p. 281), Plaintiff saw an orthopedic surgeon on December 9, 2019 (Doc. 63-4, p. 7).  Dr. Alan Froehling prepared the following report:

> He presents now with recurrent right sciatic pain, it is rather severe. He is having difficulty walking. He can't stand on his tiptoes on the right side. Dorsiflexion is weak. He has numbness in all five toes of his right foot. The right ankle reflex is absent. He has a markedly positive straight leg raising sign on the right. He has multiple scars on his lower back. He has two midline scars and two paraspinal scars, so it looks like he has had some minimally invasive surgical work.
>
> This man needs an MRI scan of his lumbar spine. He might need a myelogram with post-myelographic CT scanning if we don't get some diagnostic results from that. I am no longer performing spinal

> surgery, but it looks to me like he probably needs a decompression for right L5 and right S1 radiculopathy. Further work up is indicated including consultation with a neurosurgeon. His best bet would probably be to go back to Peoria to Dr. Fassett.
>
> Impression: Recurrent right sciatica due to lumbar disc pathology.

(*Id*.).

Plaintiff underwent an MRI of his lumbar spine on January 6, 2020 (Doc. 63-4, p. 9). The MRI report stated "additional postoperative changes L5-S1 now occurring on the left…a small developing fluid collection right para midline L5-S1 probably chronic" (Doc. 63-4, p. 10). Plaintiff saw a neurosurgeon, Dr. Coppens, on February 25, 2020 (Doc. 63-4, p. 16). Plaintiff returned to Centralia with instructions to "obtain EMG of your lower extremities, lumbar x-rays, and lumbar CT. Follow up upon completion." (*Id*.).[2] The x-rays and CT scan were performed in March 2020. The CT scan report stated "mild degenerative change in both sacroiliac joints" and the x-ray report stated "flexion and extension views do not show any significant subluxation" (Doc. 634, p. 22, 26).

There are multiple records in Plaintiff's chart from March-August 2020 that indicate Plaintiff continued to report back pain but refused "exercises for back or any other techniques like meditation to help with pain" (Doc. 69-2, p. 185). One nurse noted that he said "If you won't give me my Tramadol, just get out of here and never come back!" (*Id*.). Plaintiff filed this lawsuit on August 7, 2020 (Doc. 1). On August 18, 2020, Dr. Jodi Pelegrin noted in Plaintiff's chart that she needed the results of plaintiff's EMG, but "unsure if EMG done?" (Doc. 63-3, p. 145). Plaintiff underwent an EMG on September 17, 2020 (Doc. 63-4, p. 28). The results indicated the "possibility" that Plaintiff had mild chronic right L5-S1 radiculopathy (Doc. 63-4, p. 28). Dr.

---

[2] Dr. Coppens' record indicates that prior to the February 25, 2020 visit, Plaintiff was taking Tramadol for pain (Doc. 63-4, p. 17).

Pelegrin started seeing Plaintiff every week for his back pain (Doc. 63-3, p. 154, 156, 158, 162).

Plaintiff returned to Dr. Coppens' office on October 6, 2020 and saw Jodi Walsh, Advanced Practice Nurse (Doc. 63-2, p. 23). APN Walsh noted that she reviewed Plaintiff's options with him: surgical intervention or conservative management involving nerve block injection (Doc. 63-2, p. 27). APN Walsh further noted "the patient would like to proceed with attempting an injection with pain management prior [sic] before considering surgery" (*Id.*). Plaintiff received a "guided caudal epidural steroid" injection on November 30, 2020 (Doc. 69-4, p. 79). One week later, he reported to Dr. Pelegrin that his pain was "unchanged from baseline" (Doc. 69-4, p. 37). Dr. Pelegrin noted that he would be referred back to the neurosurgeon for "next steps" in treatment (*Id.*). Dr. Pelegrin also ordered that Plaintiff "switch from cane to walker preferably with a seat" (Doc. 63-3, p. 172). Plaintiff never received the walker.

Dr. Pelegrin continued to see Plaintiff for weekly visits. At each visit in December, she noted that Plaintiff needed to see Dr. Coppens (Doc. 69-4, p. 37, 39, 41, 43). On December 28, 2020, Dr. Pelegrin noted "[r]eally needs to see NS for consult!" (Doc. 69-4, p. 43). Plaintiff went on a hunger strike from January 2-4, 2020 (Doc. 69-4, p. 42-50). Throughout the rest of January, Dr. Pelegrin continued to note that he needed to be scheduled for an appointment with Dr. Coppens (Doc. 69-4, p. 50, 55, 59).

Plaintiff saw Dr. Coppens on March 2, 2021 (Doc. 69-5, p. 109). Dr. Coppens wanted Plaintiff to return after undergoing an MRI of cervical and lumbar spine, which was performed on March 15, 2021 (Doc. 69-5, p. 109, 113). The MRI report stated "no apparent acute spinal stenosis or neural foraminal narrowing although exam is limited in the region of postoperative changes due to metallic artifact and motion" (Doc. 69-5, p. 113).

Plaintiff returned to see Dr. Coppens on May 11, 2021 (Doc. 63-7, p.31). He was

scheduled for a follow-up visit on June 8, 2021 (*Id*.). In his Motion and during the evidentiary hearing, Plaintiff explains that Dr. Coppens did not have Plaintiff's MRI results available for the May 11, 2021 visit. On May 14, 2021, Dr. Coppens reviewed Plaintiff's MRI results and noted that Plaintiff "would not be expected to benefit from cervical or lumbar spine surgery at this time" (Doc. 63-7, p. 22). At the June 8, 2021 visit, Dr. Coppens instructed Plaintiff to follow-up with pain management and discharged Plaintiff from his care (Doc. 63-7, p. 46). Through June and July 2021, Plaintiff saw a doctor at Centralia almost every week (Doc. 69-5, p. 69, 71, 73, 75).

Plaintiff saw Dr. Hugh Berry at a pain management clinic on July 26, 2021 (Doc. 74-1, p. 4). Dr. Berry noted the following plan: 1) schedule "rt S1 TRESI with hyaluronidase"; and 2) "can speak to physician at facility to recommend medication regiman [sic] if needed. Possible gabapentin" (Doc. 74-1, p. 9). Plaintiff filed the Motion for Preliminary Injunction on July 29, 2021.

## Evidentiary Hearing

Plaintiff testified that for the last 18 months, he has been living in the Health Care Unit at Centralia. During that time, he has been able to sleep on a better mattress which "helped tremendously." He also received a special cushion that helped relieve some of his pain. He has a cane, but using the cane causes him "more trouble" in his upper extremities. Every time he "leans over" on the cane, "it hurts." Sometimes he uses a wheelchair. Dr. Pelegrin explained to him that a walker would help alleviate the stress on his upper extremities and allow him to sit down if he needed to take a break from walking. He never received the walker that she ordered. Plaintiff explained that "for the first six or seven months [after she ordered the walker] they were telling me they don't know why it hasn't come yet. Now they say I have to be re-evaluated by a doctor but we don't have a doctor."

Plaintiff has not seen a doctor in approximately the last two months. There is currently no doctor at Centralia. None of the medication that Dr. Santos prescribed for Plaintiff helped his pain. Plaintiff recalls asking Dr. Santos to look at his prior medical records and Dr. Santos told him "file a grievance, get a lawyer, sue me" and started laughing hysterically.

Plaintiff has been in pain throughout his tenure at Centralia. The pain is now worse than when he arrived in April 2017. On a typical day, Plaintiff's pain level is 9/10. Plaintiff does not necessarily want to undergo another surgery. He explained that recovering from his previous back surgeries was very difficult and he does not want to complete the recovery process at Centralia. However, he is "willing to listen to the doctors because they know more than I do." If a doctor recommends further surgery, he will follow the doctor's advice.

Plaintiff recalled that earlier this year, he went to see Dr. Coppens after undergoing the MRI. The officers who accompanied him to Dr. Coppens were supposed to bring his medical records, but they failed to do so. Dr. Coppens was unable to access Plaintiff's MRI results during the visit, so Plaintiff's visit was "for nothing." Plaintiff returned for another visit after Dr. Coppens was able to view the MRIs. Dr. Coppens told him that "surgery might help, it might not" and recommended that Plaintiff return to the pain management clinic. Plaintiff saw Dr. Berry, who recommended Plaintiff return for another injection. Plaintiff wants to follow Dr. Berry's advice, but he has no idea whether he is scheduled to receive the injection from Dr. Berry.

Defendants did not call any witnesses.

## Legal Standard

The Prison Litigation Reform Act ("PLRA") mandates that any preliminary injunctive relief ordered in this case must be "narrowly drawn, extend no further than necessary to correct the harm . . . ," and "be the least intrusive means necessary to correct that harm." 18 U.S.C. §

3626(a)(2). To obtain a preliminary injunction, Plaintiff must establish that (1) he will suffer irreparable harm without the injunction; (2) "traditional legal remedies are inadequate"; and (3) he has "some likelihood of succeeding on the merits." *Mays v. Dart,* 974 F.3d 810, 818 (7th Cir. 2020) (internal citations omitted). An injunction that requires an affirmative act by the respondent is a mandatory preliminary injunction and should be "sparingly issued." *Id.*, (*citing Graham v. Med. Mut. of Ohio*, 130 F.3d 293, 295 (7th Cir. 1998)).

First, Plaintiff has established that he will suffer irreparable harm if the mandatory preliminary injunction is not granted. Irreparable harm is that which Plaintiff cannot "easily wait to the end of trial to get." *Roland Machinery Co. v. Dresser Indus.*, 749 F.2d 380, 386 (7th Cir. 1984). Plaintiff's testimony and medical records show that he has been in significant pain since April 2017. He testified that his pain has only increased in the last four and a half years. On the evidence presented, the Court has no basis to find that Plaintiff can "easily wait" until trial to receive necessary medical treatment. Plaintiff has also established that traditional legal remedies are inadequate. If he prevails at trial the jury may award him money damages, but monetary compensation hardly seems adequate for Plaintiff's ongoing pain that he rates at 9/10 nearly every day.

Next, Plaintiff must show "some likelihood" that he will prevail on the merits of his claims. *Mays,* 974 F.3d at 822 (internal citations omitted). To prevail on his deliberate indifference claim against Defendants Santos and Nalewajka, Plaintiff must establish that his condition was "objectively, sufficiently serious" and second, that the "prison officials acted with a sufficiently culpable state of mind." *Greeno v. Daley*, 414 F.3d 645, 652-53 (7th Cir. 2005) (citations and quotation marks omitted). Plaintiff's medical history and his testimony establish that his back pain is sufficiently serious to prevail on a deliberate indifference claim and Defendants do not

contend that Plaintiff's condition is not sufficiently serious.

Dr. Santos and Wexford ("the Wexford Defendants") do argue, however, that Plaintiff cannot establish they acted with a sufficiently culpable state of mind because he has "receiv[ed] treatment for his conditions." This argument is not persuasive because "to prevail on an Eighth Amendment claim 'a prisoner is not required to show that he was literally ignored.'" *Greeno*, 414 F.3d at 653-54, (quoting *Sherrod v. Lingle*, 223 F.3d 605, 611 (7th Cir. 2000) (other citations omitted). Moreover, persisting in a course of treatment known to be ineffective may constitute deliberate indifference. *Id*. at 655. It appears that from April 2017-September 2019, Defendant Dr. Santos persisted in a conservative course of treatment (mostly over the counter pain medication) for Plaintiff that was ineffective. Accordingly, Plaintiff has established a reasonable likelihood that he can prevail in his claim against Dr. Santos.

Since September 2019, Plaintiff has seen specialists, but many of those visits were significantly delayed. For example, in early December 2020, Dr. Pelegrin noted that Plaintiff needed to return to the neurosurgeon (Doc. 69-4, p. 37). Several weeks later, she noted that he "[r]eally need[s] to see NS for consult!" (Doc. 69-4, p. 43). Plaintiff did not return to the neurosurgeon until March 6, 2021. Perhaps there was a good reason for this delay, but Defendants have not provided it to the Court. A delay in treatment may constitute deliberate indifference if it "unnecessarily prolong[s]" the inmate's pain. *Perez v. Fenoglio*, 792 F.3d 768, 778 (7th Cir. 2015).

Furthermore, nearly two months have passed since Dr. Berry recommended that Plaintiff be scheduled for a "rt S1 TRESI with hyaluronidase." Dr. Berry also offered to speak with a physician at Centralia regarding a medication regimen. Nearly a year has passed since Dr. Pelegrin ordered the walker. Plaintiff testified that he continues to experience significant pain.

Because Defendants provide no evidence to the contrary, the Court can only assume that Wexford staff literally ignored Dr. Pelegrin's order and Dr. Berry's recommendations.

Wexford cannot be vicariously liable for the actions of its physicians, but can be liable for, *inter alia*, a "widespread and persistent practice that amounted to a custom approaching the force of law" that caused a deprivation of Plaintiff's Constitutional rights. *Howell v. Wexford Health Sources, Inc.*, 987 F.3d 647, 653 (7th Cir. 2021) (*citing Monell*, 436 U.S. at 690-91)*; Glisson v. Indiana Dep't of Corrections*, 849 F.3d 372, 379 (7th Cir. 2017) (en banc). There are no "bright-line" rules "regarding the quality, quantity, or frequency of conduct needed to prove a widespread custom or practice." *Id.* at 654 (*quoting Thomas v. Cook Cty Sheriff's Dept.*, 604 F.3d 293, 303 (7th Cir. 2010)). Plaintiff must provide evidence from which a jury could reasonably infer that "a series of violations" occurred, not "isolated acts of misconduct." *Id*. (internal citations omitted). Given the number of delays involved in Plaintiff's care (and the lack of justification for those delays), there is "some likelihood" that Plaintiff will be able to establish a "series of violations" that resulted in a violation of his Eighth Amendment rights.

As for Plaintiff's claim against Defendant Nalewajka, her involvement in Plaintiff's care is unclear. She contends that she does not have the authority to carry out any of Plaintiff's requested injunctive relief. The Court likewise presumes that Dr. Santos no longer has such authority, since he no longer treats patients at Centralia. Regardless, Defendants do not argue that Wexford cannot carry out Plaintiff's requested relief, so Defendant Nalewajka's and Dr. Santos' lack of authority does not prevent the Court from granting Plaintiff's motion.[3]

Having found that Plaintiff has established some likelihood of success on his claims against Defendants Wexford and Santos, that traditional legal remedies are inadequate, and irreparable

---

[3] Of course, the Court could add the Centralia's Warden as a defendant for purposes of carrying out injunctive relief, which is what Plaintiff asks the Court to do. *Gonzalez v. Feinerman*, 663 F.3d 311, 315 (7th Cir. 2011).

harm without an injunction, a "sliding scale approach" is used to determine whether the irreparable harm Plaintiff would endure outweighs any irreparable harm Defendants would suffer if the Court grants the requested relief. *Mays*, 974 F.3d at 818. The Wexford Defendants argue that they would be irreparably harmed by the Court "overrul[ing] the judgment of the medical professionals treating Plaintiff." This argument begs the question-who are Plaintiff's treating physicians? Plaintiff testified that there is no doctor currently treating patients at Centralia, and Defendants provided no evidence to the contrary. The last doctor Plaintiff saw was Dr. Berry, who recommended that Plaintiff be scheduled for a "schedule "rt S1 TRESI with hyaluronidase." Plaintiff asks the Court to enter an injunction that follows orders and recommendations by Dr. Berry (who treated Plaintiff within the last two months) and Dr. Pelegrin (who previously treated Plaintiff at Centralia). Defendants did not present any evidence establishing Plaintiff has another treating physician who, in the exercise of medical judgment, disagrees with Dr. Berry's and Dr. Pelegrin's orders/recommendations. Accordingly, the Court finds that the Plaintiff's irreparable harm-enduring significant back pain-is outweighed by any harm to Defendants.

## Conclusion

Plaintiff's Motion for Preliminary Injunction is GRANTED. The Clerk of Court is directed to add the Warden of Centralia as a Defendant in his/her official capacity solely for the purpose of carrying out injunctive relief. *Gonzalez*, 663 F.3d at 315. Considering the PLRA's requirement that injunctive relief be "narrowly drawn," the Court issues a mandatory preliminary injunction as follows:

> Defendants are ORDERED to schedule and facilitate an appointment with Dr. Berry (or another pain management physician who practices with Dr. Berry). The appointment shall take place within 30 days of the date of this Order. If Dr. Berry (or another pain management physician who practices with Dr. Berry) has no available appointments within 30 days of the date of this Order, Defendants shall schedule and facilitate an appointment for Plaintiff on Dr. Berry's (or a pain

management physician who practices at his clinic) first available date. Defendants shall provide a Notice to the Court that advises the Court of the outcome of that appointment, i.e., whether the doctor provided an injection to Plaintiff or otherwise recommended further treatment. Defendants are further ORDERED to arrange for a physician who is treating patients within the IDOC to evaluate Plaintiff for a walker for Plaintiff to use at Centralia Correctional Center within 7 days of the date of this order. Defendants shall provide a Notice to the Court that advises the Court of the results of that evaluation.

**IT IS SO ORDERED.**

**DATED: September 30, 2021**

*s/ Reona J. Daly*
**Hon. Reona J. Daly**
**United States Magistrate Judge**