IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| **BRIAN LEE BIRGE,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| vs. | ) Case No. 20-cv-769-RJD |
| | ) |
| **VENERIO SANTOS, M.D., LANA NALEWAJKA, and WEXFORD HEALTH SOURCES, INC.,** | ) ) ) ) |
| | ) |
| **Defendants.** | |

# ORDER

**DALY, Magistrate Judge:**

Plaintiff, an inmate of the Illinois Department of Corrections (IDOC), filed this suit pursuant to 42 U.S.C. §1983. Doc.1. Plaintiff alleges that Dr. Venerio Santos and Lana Nalewajka were deliberately indifferent to his serious medical needs at Centralia Correctional Center. Doc. 100.[1] Dr. Santos is employed by Wexford Health Sources, Inc. ("Wexford"), a company that contracts with IDOC to provide medical treatment of IDOC inmates. *Id*. Plaintiff alleges that Wexford "adopted and implemented policies, practices and/or procedures" that caused his Eighth Amendment rights to be violated. *Id*., ¶185.

This matter comes before the Court on the Motion for Summary Judgment (Docs. 187 and 188) filed by Defendants Wexford and Santos. Plaintiff has not yet filed a Response, but filed a "Joint Motion for Extension of Time to file Response/Reply as to Motion for Summary Judgment". Doc. 189. Both motions are DENIED.

---

[1] Plaintiff's Second Amended Complaint contained a claim of retaliation against Wexford and other Defendants, and Defendants' current motion ask the Court to grant summary judgment in favor of Wexford. That claim was dismissed in its entirety for Plaintiff's failure to exhaust his administrative remedies. Docs. 166.   In their Motion

**Medical Records and Litigation History**

In 2011-2015, Plaintiff underwent three back surgeries to treat degenerative disc disorder, herniated discs, and spinal stenosis (Doc. 63-1, p. 4; Doc. 188-1, p. 35; Doc. 188-2, p.3).[2]  After the second surgery, his surgeon made the following note:

> Mr. Birge continues to have pain that is out of proportion to our average patient and many other patients with chronic pain.   Prior to proceeding with this revision surgery, I had extensive discussions with him about pain control after surgery.  I informed him that I would only be supplying reasonable amounts of medications after surgery and would only supply medications for 6 weeks after surgery.   At this stage, I am willing to provide him with Norco and a muscle relaxant for discharge.   We will obtain a CT prior to DC to ensure that hardware is appropriately positioned.
>
> We will try to have him see a pain specialist after discharge. I suspect he will continue to have pain over the long-term and will be challenging to wean off medications.

Doc. 188-2, p. 14.

Plaintiff arrived at Centralia Correctional Center in March or April 2017.  Doc. 1, p. 5. In Plaintiff's medical "Transfer Summary" paperwork, a nurse noted his history of spinal surgery and that he had "heartburn, low back, substance abuse".  Doc. 188-1, p. 22.  The "health information administrator" at Centralia ordered Plaintiff's prior medical records in June 2017. Doc. 69-1, p. 244.  Plaintiff's medical records from Centralia indicate that he regularly saw a physician in 2017, but the physicians' handwritten notes are mostly illegible.  Doc. 69-1.[3]  Doc.

---

[2] From the medical records, it appears that Plaintiff was not incarcerated from 2011-2015.

[3] Defendants attach the illegible records to their summary judgment motion and include an interpretation (presumably by their attorney) of those records in the Statement of Material Facts regarding who ordered the medications and the dosages.   However, there is no deposition testimony or affidavit that explains to the Court what is written in those illegible records.   The Court previously interpreted and analyzed the legible portions of those records to rule on Plaintiff's Motion for Preliminary Injunction and uses that analysis again for purposes of ruling on Defendants' summary judgment motion.  Doc. 81.   There appears to be no significant conflicts between the Court's analysis and Defendants' attorney's analysis, other than defense counsel can read the handwriting better than the Court can and extract more information from the records than the Court.   For example, defense counsel can decipher Dr. Santos' signature and knows which visits Dr. Santos saw Plaintiff in 2017-not surprising, because Dr. Santos is his client-but defense counsel cannot act as a witness and lay foundation for otherwise illegible medical records.

69-1. It appears that the physician ordered Motrin 400 mg, twice daily in May 2017 and then increased that dosage to 600 mg twice daily in June 2017. *Id.*, pp. 35, 41. The physician then ordered Mobic in June 2017 (dosage illegible) and went back to Motrin in August 2017, but at 600 mg three times daily. *Id.*, pp. 42, 48. Plaintiff reported 10/10 back pain on September 21, 2017 and it appears that on September 22, 2017, he saw a doctor for "severe back pain", and the physician again ordered Motrin, 600 mg to be taken three times daily. *Id.*, pp. 54, 57. A physician ordered Mobic, 600 mg to be taken three times a day on December 22, 2017. Doc. 188-1, p. 8. In January 2018, Plaintiff reported to a nurse that Motrin 600 mg was not effective. Doc. 69-1, p. 69. Defendant Dr. Santos ordered Tylenol, 500 mg to be taken 1-2 times daily as needed. Doc. 188-1, p. 26.

Dr. Santos ordered x-rays of Plaintiff's lumbar spine in April 2018. Doc. 63-4, p. 24. The radiologist's report stated that Plaintiff had degenerative changes at the sacroiliac joint "on both sides." *Id*. Dr. Santos ordered Naprosyn, 500 mg twice a day. Doc. 188-1, p. 28; Doc. 69-1, p. 82. Plaintiff rated his back pain at 8-9/10 on May 2, 2018. Doc. 69-1, p. 84. A nurse noted that his pain "goes down leg." *Id*. The nurse also noted "meds not helping neither are the exercises. Stated has been walking." *Id.*, p. 85. A physician ordered Motrin, 600 mg to be taken twice daily and Robaxin, 750 mg to be taken twice daily. Doc. 188-1, p. 28. Plaintiff continued taking Motrin, 600 mg three times a day in October 2018, when he reported to a nurse that he had "shooting pain" with side-to-side movement. Doc. 69-1, p. 117, 118.

In August 2019, a physician noted that Plaintiff "may wear lumbosacral brace continue back exercises." *Id.*, p. 46. Plaintiff submitted multiple grievances related to treatment of his back pain in September and October 2019. Doc. 63-6, pp. 4, 6, 11, 15, 16, 18, 20. Dr. Santos ordered Cymbalta on September 12, 2019, which Plaintiff did not want to take because he believed

it was a "psychotropic and nerve agent." *Id*., p. 6.

Also on September 12, 2019, Dr. Santos requested permission from Wexford through the "collegial review process" to send Plaintiff to an orthopedic surgeon. Doc. 63-3, p. 179-806. Dr. Ritz, a "dedicated utilization management physician" with Wexford, denied this request. *Id*., p. 805. Plaintiff then underwent a physical therapy evaluation and received a "Home Exercise Program" to perform on his own. Doc. 69-2, p. 279. The physical therapist further noted "he would benefit from skilled physical therapy to address these deficits…he may also benefit from further imaging to rule out internal damage." *Id*.

A nurse noted that Plaintiff was on a hunger strike in November 2019. Doc. 188-1, p. 57. A physician noted "add Pamelor" and "order gel mattress." *Id*.[4] Plaintiff saw an orthopedic surgeon on December 9, 2019. Doc. 63-4, p. 7. Dr. Alan Froehling prepared the following report:

> He presents now with recurrent right sciatic pain, it is rather severe. He is having difficulty walking. He can't stand on his tiptoes on the right side. Dorsiflexion is weak. He has numbness in all five toes of his right foot. The right ankle reflex is absent. He has a markedly positive straight leg raising sign on the right. He has multiple scars on his lower back. He has two midline scars and two paraspinal scars, so it looks like he has had some minimally invasive surgical work.
>
> This man needs an MRI scan of his lumbar spine. He might need a myelogram with post-myelographic CT scanning if we don't get some diagnostic results from that. I am no longer performing spinal surgery, but it looks to me like he probably needs a decompression for right L5 and right S1 radiculopathy. Further work up is indicated including consultation with a neurosurgeon. His best bet would probably be to go back to Peoria to Dr. Fassett.
>
> Impression: Recurrent right sciatica due to lumbar disc pathology

---

[4] Pamelor is the brand name of Nortriptyline and is "used to treat depression." mayoclinic.org/drugs-supplements/nortriptyline-oral-route (last accessed January 2, 2024).

*Id*.  One week later, Plaintiff saw a physician at Centralia who noted "may use cane Ultram 50 mg follow recommendation of orthopedist."  Doc. 188-1, p. 63.

Plaintiff underwent magnetic resonance imaging of his lumbar spine on January 6, 2020 Doc. 63-4, p. 9.  The MRI report stated "additional postoperative changes L5-S1 now occurring on the left…a small developing fluid collection right para midline L5-S1 probably chronic."  *Id.*, p. 10.  On January 31, 2020, a nurse noted that Plaintiff said "I'm not doing those exercises they hurt my back more than help it."  Doc. 188-1, p. 66.

On February 25, 2020, Plaintiff saw a neurosurgeon, Dr. Coppens, who recommended an EMG, a lumbar CT scan, and lumbar x-rays "to decide if patient would benefit from more surgery."  Doc. 188-5, p. 4.  Four days later, a physician saw Plaintiff at Centralia and noted that he was "requesting stronger pain med but when they were not given he jumped off the chair and stormed out of the exam room without using his cane and with a normal gait."  Doc. 188-1, p. 71.  The x-rays and CT scan were performed in March 2020.  Doc. 63-4, p. 22, 26.  The CT scan report stated "mild degenerative change in both sacroiliac joints" and the x-ray report stated "flexion and extension views do not show any significant subluxation."  *Id*.

There are multiple records in Plaintiff's chart from March-August 2020 that indicate Plaintiff continued to report back pain, but refused "exercises for back or any other techniques like meditation to help with pain" (Doc. 69-2, p. 185).  One nurse noted that he said "If you won't give me my Tramadol, just get out of here and never come back!" (*Id*.).  On July 10, 2020, Plaintiff's EMG was rescheduled to September 17, 2020 "due to COVID-19."  Doc. 188-1, p. 92.

Plaintiff filed this lawsuit on August 7, 2020.  Doc. 1.  On August 18, 2020, Dr. Jodi Pelegrin noted in Plaintiff's chart that she needed the results of plaintiff's EMG, but "unsure if EMG done?" Doc. 63-3, p. 145.  Plaintiff underwent an EMG on September 17, 2020 (Doc. 63-

4, p. 28).  The results indicated the "possibility" that Plaintiff had mild chronic right L5-S1 radiculopathy (Doc. 63-4, p. 28).  Dr. Pelegrin began seeing Plaintiff every week for his back pain Doc. 63-3, p. 154, 156, 158, 162.

Plaintiff returned to Dr. Coppens' office on October 6, 2020 and saw Jodi Walsh, Advanced Practice Nurse. Doc. 63-2, p. 23.  APN Walsh noted that she reviewed Plaintiff's options with him: surgical intervention or conservative management involving nerve block injection.  Doc. 63-2, p. 27.  APN Walsh further noted "the patient would like to proceed with attempting an injection with pain management prior [sic] before considering surgery."  *Id*.  Plaintiff received a "guided caudal epidural steroid" injection on November 30, 2020.  Doc. 69-4, p. 79.  One week later, he reported to Dr. Pelegrin that his pain was "unchanged from baseline." Doc. 69-4, p. 37.  Dr. Pelegrin noted that he would be referred back to the neurosurgeon for "next steps" in treatment.  *Id*.  Dr. Pelegrin also ordered that Plaintiff "switch from cane to walker preferably with a seat." Doc. 63-3, p. 172.

Dr. Pelegrin continued to see Plaintiff for weekly visits.  At each visit in December, she noted that Plaintiff needed to see Dr. Coppens.  Doc. 69-4, p. 37, 39, 41, 43.  On December 28, 2020, Dr. Pelegrin noted "[r]eally needs to see NS for consult!"  *Id*., p. 43.  Plaintiff went on a hunger strike from January 2-4, 2021.  *Id*., p. 42-50.  Throughout the rest of January, Dr. Pelegrin continued to note that he needed to be scheduled for an appointment with Dr. Coppens.  *Id*., p. 50, 55, 59.

Plaintiff saw Dr. Coppens on March 2, 2021.  Doc. 69-5, p. 109.  Dr. Coppens wanted Plaintiff to return after undergoing an MRI of cervical and lumbar spine, which was performed on March 15, 2021.  *Id*., p. 109, 113.  The MRI report stated "no apparent acute spinal stenosis or neural foraminal narrowing although exam is limited in the region of postoperative changes due

to metallic artifact and motion." *Id.*, p. 113.

Plaintiff returned to see Dr. Coppens on May 11, 2021. Doc. 63-7, p.31. He was scheduled for a follow-up visit on June 8, 2021. *Id*. On May 14, 2021, Dr. Coppens reviewed Plaintiff's MRI results and noted that Plaintiff "would not be expected to benefit from cervical or lumbar spine surgery at this time." *Id.*, p. 22. At the June 8, 2021 visit, Dr. Coppens instructed Plaintiff to follow-up with pain management and discharged Plaintiff from his care. *Id.*, p. 46. Through June and July 2021, Plaintiff saw a doctor at Centralia almost every week. Doc. 69-5, p. 69, 71, 73, 75.

Plaintiff saw Dr. Hugh Berry at a pain management clinic on July 26, 2021. Doc. 74-1, p. 4. Dr. Berry noted that the November 2020 epidural steroid injection ("ESI") provided no relief. Doc. 188-3, p. 25. Dr. Berry recommended another ESI and that he could "speak to physician at facility to recommend medication regimen if needed. Possible gabapentin." Doc. 74-1, p. 9.

Plaintiff filed a Motion for Preliminary Injunction on July 29, 2021. The Court held a hearing on September 21, 2021. Plaintiff testified that he never received the walker that Dr. Pelegrin ordered for him. He further testified that, at that time, he had not seen a doctor in two months because there was no doctor at Centralia. On September 30, 2021, the Court entered the following preliminary injunction:

> Defendants are ORDERED to schedule and facilitate a visit with Dr. Berry (or another pain management physician who practices with Dr. Berry). The appointment shall take place within 30 days of the date of this Order. If Dr. Berry (or another pain management physician who practices with Dr. Berry) has no available appointments within 30 days of the date of this Order, Defendants shall schedule and facilitate an appointment for Plaintiff on Dr. Berry's (or a pain management physician who practices at his clinic) first available date. Defendants shall provide a Notice to the Court that advises the Court of the outcome of that appointment, i.e., whether the doctor provided an injection to Plaintiff or otherwise recommended further treatment. Defendants are further ORDERED

> to arrange for a physician who is treating patients within the IDOC to evaluate Plaintiff for a walker for him to use at Centralia Correctional Center within 15 days of the date of this order. Defendants shall provide a Notice to the Court that advises the Court of the results of that evaluation.

Doc. 81.

Plaintiff saw Dr. Percy Myers at Centralia on October 5, 2021. Doc. 87-1, p. 1. Dr. Myers' note states "went to court to have an appt with the pain clinic….ambulatory with a cane but would benefit greatly from assistance with a walker…provide him with a walker." *Id*. Plaintiff saw Dr. Berry on October 13, 2021. Doc. 89-1. Dr. Berry noted "he improved in past from epidural he said to the extent with medications and his walker he can function better." *Id*. Dr. Berry also noted "[t]oday he will have a right selective sacral one nerve block with steroid added. Recommend trial of gabapentin in hopes to avoid additional need for injections. Recommend seated walker with wheels to help with symptomatic relief. If he does not improve would recommend follow up with neurosurgery." *Id*.

Plaintiff transferred to Pinckneyville Correctional Center on October 25, 2021. Dr. Myers saw Plaintiff on November 28, 2021 and wrote the following note:

> Discussed with him all the results of his studies and his surgical evaluation and the fact that he is not a surgical candidate. I offered him Pamelor/Cymbalta for pain control and he stated that those did not work. [Illegible] the xylocaine patch and asked if he had questions. Also advised him to walk with the walker in front of his body. Also encouraged him to continue current meds.

Doc. 188-6, p. 11. On December 6, 2021, a nurse noted that he was "noncompliant this a.m. for medline and said would not take any more because it doesn't help. Wants Norco because it's the only med that works. And wants to see a specialist." Doc. 188-6, p. 12.

**Plaintiff's deposition testimony**

Plaintiff testified that he tried the various medications that Dr. Santos prescribed to him,

but those medications did not help.  Doc. 188-8, pp. 70-72.  After Plaintiff's first year at Centralia, Dr. Santos told Plaintiff "he's not going to help me and [I should] sue him."  Doc. 188-8, p. 52. Plaintiff testified that it was impossible for him to perform some of the stretches and exercises recommended by Dr. Santos.  *Id*., pp. 67-69.  He can walk, so he did that at Centralia and continues to walk at Pinckneyville.  *Id*.

After arriving at Pinckneyville, he was no longer able to have his walker, gel mattress, or back brace.  *Id*., p. 95.  Dr. Myers gave him a wheelchair to use, and whenever he must travel any significant distance someone pushes him in the wheelchair because he walks too slowly.  *Id*., p. 119.  Plaintiff would rather be walking.  *Id*., p. 106.  Ibuprofen is the only medication Dr. Myers will give him.  *Id*., p. 96.  Plaintiff understands his doctors' concerns regarding drug-seeking behavior.  *Id*., p. 148.  He received narcotic pain medication for "the last two years [at] Centralia" prescribed by Dr. Pelegrin, and those medications "helped a little bit."  *Id*., p. 107.  Instead of taking narcotic pain medication, he would rather undergo surgery to alleviate his pain.  *Id*.

Plaintiff requests to be seen for his back pain at Pinckneyville.  *Id*., p. 132.  The nurses will see him on nurse sick call and talk to him about his pain, and give him Ibuprofen (which does not help).  *Id*.  They tell him "we got to put you in to see the doctor….that's what they do, but the doctor never sees me."  *Id*.

When asked about the treatment he received at the pain clinic, Plaintiff testified that the steroid injections only helped for the first 24-48 hours post injection, then he again had pain "right back to shooting down my spine and down my leg."  *Id*., p. 129.  The pain clinic also proposed "shock therapy" and "some type of radiation" but Wexford and IDOC refuse to consider those options.  *Id*., p. 89.  However, Plaintiff does not "want to keep going to all these doctors, trying

all these different things and nothing working." *Id*., p. 91.

Plaintiff testified that he feels like the same scenario replays every time he sees a specialist. *Id*., p. 124-25. IDOC/Wexford send him to the specialist. *Id*., p. 124. The specialist inevitably does not have records of Plaintiff's previous treatment, and has to "guess at what's been done with [his] spine." *Id*., p. 151. Plaintiff then returns to the prison and immediately sees a doctor or nurse practitioner in the health care unit who tells him "well, we [have] got to wait for the records." *Id*., p. 124-25. Then Plaintiff waits for another six months or a year, and nothing happens. *Id*. Then he goes to see a specialist again, perhaps a new one, and the same pattern persists. *Id*. He has been suffering with pain and "going through the dance with the doctors and all of the stuff that I have to jump through just to get to see a doctor" for seven years now and he feels like he would be "probably better off dead" than repeating this cycle for another seven years. *Id*., p. 97.

## Discussion

Summary judgment is appropriate only if the moving party can demonstrate "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322(1986); *see also Ruffin-Thompkins v. Experian Information Solutions, Inc.*, 422 F.3d 603, 607 (7th Cir. 2005). The moving party bears the initial burden of demonstrating the lack of any genuine issue of material fact. *Celotex*, 477 U.S. at 323. That burden must be met by either:

> (a) citing to particular parts of the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (b) showing that the materials cited do not establish the presence…of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c).  Here, Defendants' arguments are not supported by admissible evidence in the record and therefore their Motion for Summary Judgment must be denied.

At trial, Plaintiff must provide "evidence, either direct or circumstantial" that shows (1) "he had an objectively serious medical need" (2) "which [Defendants] "[knew] of and disregard[ded] a substantial risk of harm." *Id*. at 550.  Negligence or even recklessness does not constitute deliberate indifference; the defendant must have shown "something approaching a total unconcern for the prisoner's welfare in the face of serious risks."  *Id*.

When the Court held a hearing on Plaintiff's Motion for Preliminary Injunction, Wexford and Dr. Santos presented no witnesses and relied solely on their attorneys' interpretation of the medical records.   This approach was problematic, as the undersigned explained:

> It appears that from April 2017-September 2019, Defendants Wexford and Dr. Santos persisted in a conservative course of treatment (mostly over the counter pain medication) for Plaintiff that was ineffective.
>
> Since then, Plaintiff has seen a specialist, but many of those visits were significantly delayed.  For example, in early December 2020, Dr. Pelegrin noted that Plaintiff needed to return to the neurosurgeon (Doc. 69-4, p. 37).  Several weeks later, she noted that he "[r]eally need to see NS for consult!" (Doc. 69-4, p. 43). Plaintiff did not return to the neurosurgeon until March 6, 2021. **Perhaps there was a good reason for this delay, but Defendants have not provided it to the Court.** A delay in treatment may constitute deliberate indifference if it "unnecessarily prolong[s]" the inmate's pain. *Perez v. Fenoglio*, 792 F.3d 768, 778 (7th Cir. 2015).
>
> Furthermore, nearly two months have passed since Dr. Berry recommended that Plaintiff return for a pain injection. Dr. Berry also offered to speak with a physician at Centralia regarding a medication regimen. Nearly a year has passed since Dr. Pelegrin ordered the walker.   Plaintiff testified that he continues to experience significant pain.  **Because Defendants provide no evidence to the contrary**, the Court can only assume that Dr. Pelegrin's order and Dr. Berry's recommendations have literally been ignored by Wexford

Doc. 81, pp. 9-10.

More than two years later, Defendants once again rely solely on their attorneys' interpretations of the medical records. Without any explanation from Dr. Santos as to *why* certain treatment decisions were made, and considering Plaintiff's testimony regarding the extreme amount of pain/discomfort that he suffered, the medical records reflect the following events that a jury could find constitute deliberate indifference: (1) providing conservative treatment (over the counter medication, back brace, exercises) for two and a half years before sending Plaintiff to a specialist; (2) ignoring the September 2019 recommendation from the physical therapist that Plaintiff "would benefit from skilled physical therapy to address these deficits"; (3) the 4-8 month delays that occurred between visits to the neurosurgeon; (4) the 10-month delay in receiving the walker with a seat.

Defendants argue that Plaintiff "cannot demonstrate there was a known treatment option that Dr. Santos failed to pursue which would have alleviated his pain." This argument ignores the September 2019 recommendation from the physical therapist. Moreover, Plaintiff testified that the narcotic pain medication he ultimately received at Centralia from Dr. Pelegrin helped "a little bit." A reasonable juror could certainly infer that Dr. Santos had legitimate concerns about giving Plaintiff narcotic pain medication, but without any testimonial evidence from Dr. Santos the same juror could infer that Dr. Santos acted with "a total unconcern" for Plaintiff's welfare by failing to prescribe him something stronger than over-the-counter medication. There is also conflicting evidence regarding whether the steroid injections helped Plaintiff. At his deposition, Plaintiff testified that they did not. However, Dr. Berry noted in the October 2021 record that the previous steroid injection, along with the medications that Plaintiff was taking at that time, alleviated Plaintiff's pain. Overall, the evidence viewed in the light most favorable to Plaintiff creates a

genuine issue of material fact regarding whether Dr. Santos treated Plaintiff's pleas for relief with deliberate indifference.[5]

As for Plaintiff's claim against Wexford, Plaintiff may prevail at trial if he establishes "a widespread and persistent practice that amounted to a custom approaching the force of law" that caused a deprivation of Plaintiff's constitutional rights. *Howell v. Wexford Health Sources, Inc.*, 987 F.3d 647, 653 (7th Cir. 2021) (*citing Monell*, 436 U.S. at 690-91); *Glisson v. Indiana Dep't of Corrections*, 849 F.3d 372, 379 (7th Cir. 2017) (en banc). As the undersigned previously noted when ruling on Plaintiff's Motion for Preliminary Injunction,

> There are no "brightline" rules "regarding the quality, quantity, or frequency of conduct needed to prove a widespread custom or practice." *Id.* at 654 (*quoting Thomas v. Cook Cty Sheriff's Dept.*, 604 F.3d 293, 303 (7th Cir. 2010)). Plaintiff must provide evidence from which a jury could reasonably infer that "a series of violations" occurred, not "isolated acts of misconduct." *Id*. (internal citations omitted). Given the number of delays involved in Plaintiff's care (and the lack of justification for those delays), there is "some likelihood" that Plaintiff will be able to establish a "series of violations" that resulted in a violation of his Eighth Amendment rights.

Doc. 81, p. 10.

Similar to Plaintiff's claim against Dr. Santos, nothing has changed since the hearing on Plaintiff's Motion for Preliminary Injunction. The record still contains evidence from which a jury could infer that the delays and/or refusals to send him to a specialist constitute a "series of violations" of his Eighth Amendment rights, with very little explanation for those delays and/or refusals.[6] It is unclear whether Plaintiff ever returned to a specialist after Dr. Berry noted "if he

---

[5] Defendants argue that Dr. Santos' liability cannot extend past 2020, but provides no evidence in the record for that argument. They contend-but did not include in their Statement of Undisputed Facts-that Dr. Santos left Centralia in 2020. The records themselves do not establish which treatment decisions and/or delays were attributed to a staff member other than Dr. Santos. Plaintiff testified at the preliminary injunction hearing that there was *no* doctor treating patients at Centralia from 2021-2023, but the record does not reflect when Dr. Santos left Centralia.

[6] Defendants argue throughout their motion that the delays were caused by Covid; while that may be true, the only

does not improve (with Gabapentin or steroid injections) would recommend follow up with neurosurgery" in October 2021. Defendants contend that Plaintiff was approved for a visit to a pain management clinic in May 2023, but the only record they cite in support of this contention simply reflects that a referral was made. Doc. 188-7. Accordingly, the jury could infer that the delays and/or refusals to provide treatment has apparently followed Plaintiff from Centralia to Pinckneyville, and attribute those delays/refusals to a Wexford custom. Defendants have failed to meet their burden in showing that summary judgment should be granted in their favor.

### Conclusion

Defendants' Motion for Summary Judgment (Docs. 187 and 188) is DENIED. Plaintiff's "Joint Motion for Extension of Time to File Response/Reply" is DENIED AS MOOT. This case proceeds to trial on March 12, 2024.

**IT IS SO ORDERED.**

**DATED: January 4, 2024**

*s/ Reona J. Daly*
**Hon. Reona J. Daly**
**United States Magistrate Judge**

---

evidence they have submitted to support this argument is one record that states Plaintiff's EMG was delayed from July 2020 until September 2020. That record, along with the Court's general knowledge that the pandemic caused delays for medical care, does not resolve whether any other delays in Plaintiff's care are attributed to Covid.